O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT STANLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2106 |
| | § | |
| CITY OF BAYTOWN, TEXAS, | § | |
| BYRON JONES, and | § | |
| OFFICER EDGAR ELIZONDO, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending are Defendant Edgar Elizondo's Motion for Summary

Judgment (Document No. 32) and Defendants City of Baytown, Texas's

and Byron Jones's Motion for Summary Judgment (Document No. 34).[1]

After having carefully reviewed the motions, responses, and the

applicable law, the Court concludes as follows:

I.   Background

Plaintiff Robert Stanley ("Plaintiff") brings this 42 U.S.C.

§ 1983 action against the City of Baytown, Texas ("Baytown" or the

"City"), Officer Edgar Elizondo ("Elizondo") of the Baytown Police

---

[1] Also pending is Defendants' Motion to Dismiss Plaintiff's
State Law Claims (Document No. 17).  Plaintiff subsequently agreed
to dismiss his state law claims by filing a First Amended Complaint
(Document No. 38), which omitted all such claims.  Plaintiff in his
First Amended Complaint also dismissed all claims against all other
Defendants except for the three who now move for summary judgment.
The Motion to Dismiss is therefore DENIED AS MOOT.

Department, and Chief of Police Byron A. Jones ("Jones") (collectively Defendants). Plaintiff alleges that Officer Elizondo violated his rights under the Fourth Amendment to be free from unreasonable seizures of his person and excessive force, and Plaintiff contends that the City and Chief Jones should be held liable for Elizondo's use of excessive force based on theories of municipal and supervisory liability.

On July 19, 2003, Plaintiff's wife Kelly Stanley called Baytown 911, stating that her husband had called her from their home and reported to her that he was experiencing symptoms that were a possible precursor to a seizure. Document No. 36 exs. E at 51-52; F at 24-26. The Baytown Fire Department and Emergency Management Service ("EMS") responded to the call. When Baytown EMT-paramedics Todd Guidry ("Guidry") and Josh Sparks ("Sparks") (collectively, the "EMTs") arrived at Plaintiff's apartment, they found Plaintiff sitting on the couch, alert and oriented. Id. exs. G at 42; H at 14. Plaintiff stated that he had not suffered a seizure but reported that he was experiencing an "aura" of a seizure. Id. exs. G at 42-43; H at 15-16.[2] According to

---

[2] According to Sparks, a typical epileptic seizure progresses in three stages: (1) the "aura" stage, during which the patient may be excited, anxious, and feel an impending sense of doom; (2) the seizure stage; and (3) the "postictal" stage, when the patient is coming out of the seizure and generally has control of his body movements but may exhibit tiredness, fatigue, and an altered mental state, including an inability to answer questions. See Document No. 45 ex. C at 17-20.

Plaintiff, he may also have told the EMTs "something like, if I have a seizure, you're never going to be able to get no needle in me, trust me." Id. ex. E at 55.

As Sparks performed a physical assessment of Plaintiff's condition, Plaintiff suffered a "grand mal" seizure that lasted for approximately thirty seconds. Id. exs. E at 55; G at 43-44; H at 27.[3] Pursuant to EMS protocols, the EMTs placed Plaintiff on the floor to prevent him from injuring himself, and Guidry returned to the ambulance to retrieve a stretcher. Id. exs. G at 43; H at 16-17, 22. When the seizure ended, Plaintiff was conscious but unresponsive. Id. ex. H at 28. Approximately ten seconds later, Plaintiff suffered a second grand mal seizure that lasted another ten seconds. Id. ex. H at 28. When this seizure ended, Sparks placed an oxygen mask on Plaintiff. Id. exs. G at 45; H at 29-30. Almost immediately, Plaintiff opened his eyes, took off the oxygen mask, jumped up, and became combative. Id. exs. G at 45; H at 30. Although the EMTs attempted to restrain Plaintiff, he overpowered them and ran out of the apartment, falling multiple times on the

---

[3] According to Sparks, seizures are generally characterized as petit and grand mal. A petit seizure is defined by the twitching or shaking of individual body parts or extremities, and the patient will typically retain his mental faculties. Grand mal seizure activity is defined by "full tonic-clonic contraction and relaxation of every muscle in [the] body," and the patient will generally have "no mental state" and be unresponsive. See Document No. 45 ex. C at 18-19. A person experiencing a grand mal seizure typically is incapable of controlling his physical actions or understanding what is being said to him. Id. at 19.

sidewalk.  Id. exs. G at 45, 56-57; H at 31-32.[4]  According to
Sparks, it did not appear that Plaintiff was in complete control of
his mental faculties, and Sparks went to the ambulance to call for
police assistance.  Id. ex. H at 32-33, 36, 54.

Guidry followed Plaintiff out of the apartment and around the
apartment complex, attempting several times to assist Plaintiff and
prevent him from further movements, but Plaintiff continued to run
away.  Id. ex. G at 57-60.  At this point, Guidry was not sure what
was wrong with Plaintiff, but he suspected that something other
than the seizures might have been the cause Plaintiff's erratic
behavior.  Id. ex. G at 56-59.  Plaintiff eventually calmed down,
and Guidry was able to coax him into the ambulance so he could be
transported to the hospital.  Id. exs. E at 57; G at 61; H at 36.
The EMTs assisted Plaintiff into the ambulance and onto a
stretcher.  Id. exs. G at 66-69; H at 37-38.  Although Plaintiff
was calm and able to follow simple commands and answer simple
questions, Plaintiff does not believe he was "fully functioning
mentally at this point."  Id. exs. E at 57; H at 36.  According to
the EMTs, when they attempted to secure Plaintiff for
transportation by placing the straps of the stretcher on him,
Plaintiff "started becoming violent" and "combative" again, kicking
his legs, swinging his arms, punching at the EMTs, and pushing them

---

[4] It is undisputed that Plaintiff was "seriously into lifting
weights" and had "body builder type muscles" at the time of this
incident.  See Document No. 36 ex. E at 63-64.

away in an effort to get off the stretcher.  Id. exs. G at 69, 78-
83; H at 41-51.[5]  The EMTs, assisted by at least two firemen who
had arrived on the scene, struggled to gain control of Plaintiff
and secure him to the stretcher but were unsuccessful.  Id. exs. G
at 69, 80-81; H at 42-43.   The EMTs also instructed Plaintiff to
calm down numerous times but Plaintiff did not respond to their
verbal commands.  Id. ex. H at 44-45.  By this point, the EMTs had
stopped trying to treat Plaintiff because EMTs "are not trained to
deal with violent people" and "the scene [was] too uncontrolled
[and] too unsafe for [the EMTs] to attempt any patient care."  Id.
ex. H at 63-65.

Shortly   thereafter,  Baytown  Police  Officer  Bert  Dillow
("Dillow") and Officer Elizondo arrived on the scene.  Id. exs. A
¶ 5; D at 30-31.  As he stood outside the back of the ambulance,
Elizondo observed Plaintiff actively resisting the EMTs' efforts to
strap him to the stretcher by kicking his legs, swinging his arms,
and raising his upper body.  Id. exs. A ¶ 7; D at 32-33; E at 80-
81; H at 46-47.  Elizondo also observed that Plaintiff was dressed

---

[5] During  his  deposition,  Plaintiff  disputed  that  he  was
"fighting" the EMTs.  Document No. 36 ex. E at 75-76.  Plaintiff
admitted, however, that he did not want to be strapped down to the
stretcher, that he repeatedly would "raise up" off the stretcher,
that the EMTs did not get a chest strap on him, that he may have
removed the leg straps, and that he was not in control of his body
movements.  Id. ex. E at 57-59, 61, 75-76, 78-79, 81.  Plaintiff
also admitted that his behavior was "somewhat cyclical" and he was
"a little bit in and out of it at this point," and he does not
remember everything that happened.  Id. ex. E at 58-59, 79.

only in his boxer shorts and was sweating profusely.  <u>Id.</u> exs. A
¶ 7; D at 32-44; E at 80.  It is undisputed that Plaintiff was not
having a seizure at this time.  <u>Id.</u> exs. E at 74-75; H at 71.
Elizondo entered the ambulance and talked to Plaintiff for
approximately three to five minutes in an effort to get him to calm
down and cooperate with the EMTs.  <u>Id.</u> exs. A ¶ 7; D at 33, 35-36;
E at 87; G at 79; H at 47-51.  Elizondo repeatedly ordered
Plaintiff to calm down and to permit the EMTs to strap him to the
stretcher so they could treat him, but Plaintiff did not respond to
Elizondo's commands and, from Elizondo's perspective, continued to
be "very aggressive."  <u>Id.</u> exs. A ¶ 7; D at 35-43; G at 79; H at
46-49.

     After several unsuccessful attempts to gain compliance from
Plaintiff, Elizondo concluded that if he "didn't do something,
someone was going to get hurt."  <u>Id.</u> exs. A ¶ 8; D at 43.  Elizondo
"determined that if [he] continued to allow [Plaintiff] to act in
this aggressive manner, [he] was either going to have to put [his]
hands on [Plaintiff] in an attempt to control him or use the
[T]aser."  <u>Id.</u> ex. A ¶ 9.  Based on his "experience in dealing with
combative people," Elizondo believed that "attempting to control a
muscular, sweaty, mostly unclothed individual was going to be very
difficult, especially in a confined space like an ambulance."  <u>Id.</u>
Elizondo therefore pulled out his Taser, showed it to Plaintiff,
and warned him that if he did not calm down and stop resisting the

EMTs' efforts to help him, he was going to be tased and "contacted with 50,000 volts of electricity." Id. exs. A ¶ 8; D at 43, 46; E at 60-61; G at 79-80; H at 50-51.[6]  Despite Elizondo's warnings, Plaintiff continued to struggle.  Id. exs. D at 43-44; G at 80-83.[7] When Plaintiff made a move to stand up, Elizondo–"in fear of getting someone hurt" and believing Plaintiff "left [him] with no other choice"--applied the Taser directly to Plaintiff's upper back for approximately two seconds.  Id. exs. A ¶ 9; D at 44, 71-72; E at 61, 79; G at 81-84; H at 49-52, 69.

Immediately after the tasing, Plaintiff's behavior changed. Id. exs. D at 44-45; G at 84; H at 52-53.  He became cooperative and appeared to regain full control of his mental faculties.  Id. exs. D at 44-45; G at 84; H at 52-53.  The EMTs strapped Plaintiff to the stretcher, secured an IV line, gave Plaintiff Valium, and began treating the injuries he incurred when he ran out of the apartment and fell on the concrete.  Id. exs. D at 44, 47; E at 62; G at 84-85; H at 53-55.  The EMTs then transported Plaintiff to the

---

[6] According to Elizondo, the "50,000" volts language was "not an accurate statement concerning the power of the [T]aser" but rather was "an attempt to get [Plaintiff] to comply with verbal commands."   Document No. 36 ex. A n.1.   In fact, the Taser "actually puts out 1.76 joules per pulse, which is much, much less than a cardiac defibrillator."  Id. exs. A n.1; C ¶ 7.

[7] When Elizondo showed Plaintiff the Taser, Plaintiff made eye contact with Elizondo but gave no other indication that he understood what Elizondo was saying.  Document No. 36 ex. D at 44, 46.

hospital without further incident.  <u>Id.</u> exs. D at 47; G at 85; H at 54-55.

During his deposition Plaintiff testified that he had been drinking beer and vodka the night before the tasing incident.  <u>Id.</u> ex. E at 48.  Plaintiff also admitted that he was on a cycle of illegal steroids at the time of the incident.  <u>Id.</u> ex. E at 91-92. Specifically, Plaintiff had been injecting himself with 200 milligrams of testosterone and 200 milligrams of decadurabolin on a weekly basis.  <u>Id.</u> ex. E at 91-95.

In his First Amended Complaint, Plaintiff alleges that Elizondo unlawfully seized and used excessive force against him in violation of his Fourth Amendment rights.  Plaintiff also alleges that Elizondo's use of allegedly excessive force was a result of the City's policy or custom authorizing the use of excessive force as well as Jones's failure adequately to supervise and train Elizondo.  Elizondo, the City, and Jones have filed motions for summary judgment seeking dismissal of all of Plaintiff's claims.

## II.   <u>Standard of Review</u>

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

8

as a matter of law." FED. R. CIV. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).  Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *See* id. at 2553-54.  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *See* Morris v. Covan Worldwide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2514-15 (1986)).  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *See* Anderson, 106 S. Ct. at 2513-14.  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351).  On the other hand, if "the factfinder could reasonably find in [the

9

nonmovant's] favor, then summary judgment is improper." <u>Id.</u>
(citing <u>Anderson</u>, 106 S. Ct. at 2511). Even if the standards of
Rule 56 are met, a court has discretion to deny a motion for
summary judgment if it believes that "the better course would be to
proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

### III.  <u>Discussion</u>

### A.  <u>Elizondo's Motion for Summary Judgment</u>

Elizondo moves for summary judgment on the grounds that he did
not violate any of Plaintiff's constitutional rights as a matter of
law and, alternatively, even if his conduct did violate Plaintiff's
constitutional rights, he is entitled to qualified immunity because
his actions were objectively reasonable in light of the clearly
established law.

#### 1.  <u>Unlawful Seizure Claim</u>

Plaintiff first alleges that Elizondo violated his Fourth
Amendment right to be free from unreasonable seizures of his person
when Elizondo "took control of the situation away from the EMS
personnel." *See* Document No. 43 at 18. According to Plaintiff,
this "seizure" was unlawful because Elizondo knew Plaintiff "was
having an seizure and that he was receiving care from the
paramedics," yet Elizondo seized Plaintiff "out of the care and
control of Baytown and administered his own cure for [Plaintiff's]

10

epilepsy--the Taser." <u>Id.</u>  In response, Elizondo contends that even if his presence in the ambulance constituted a seizure, his actions were justified because he was exercising a "community caretaking function," in order to prevent Plaintiff from harming himself and/or the EMTs and enable the EMTs to provide Plaintiff with medical treatment. *See* Document Nos. 33 at 16-18; 49 at 6-7.

Law enforcement officers not only investigate crimes but also perform "community caretaking functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." <u>Cady v. Dombrowski</u>, 93 S. Ct. 2523, 2527 (1973); *see also* <u>United States v. King</u>, 990 F.2d 1552, 1560 (10th Cir. 1993) ("[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions'").  Community caretaking functions include stopping or seizing a citizen for his own safety and/or the safety of others, regardless of the officers' suspicion of criminal activity or lack thereof. *See* <u>King</u>, 990 F.2d at 1560 ("In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.") (citing <u>United States v. Rideau</u>, 949 F.2d 718, 720 (5th Cir. 1991), *rev'd on other grounds*, 969 F.2d 1572, 1574 (5th Cir. 1992)).  In determining whether such a seizure violates an individual's Fourth

Amendment rights, the critical inquiry is whether the officers possessed "specific and articulable facts which . . . reasonably warrant[ed] [an] intrusion into the individual's liberty." <u>King</u>, 990 F.2d at 1560 (quoting <u>Terry v. Ohio</u>, 88 S. Ct. 1868, 1880 (1968)).

In this case, Officer Elizondo's actions in entering the ambulance and restraining Plaintiff in order to permit the EMTs to provide him with medical treatment fell squarely within Elizondo's community caretaking function. The EMTs' call for police assistance, coupled with the circumstances Officer Elizondo confronted when he arrived on the scene--namely, a muscular, sweaty, and uncontrollable patient who was resisting the EMTs' and firemen's physical efforts to restrain him and who was not responding to numerous verbal pleas to calm down--created a specific, articulable basis for Elizondo reasonably to believe that Plaintiff posed a threat to himself and the other people inside the ambulance. Importantly, Elizondo entered the ambulance not to investigate a crime but for the non-investigatory purpose of providing protection to the EMTs so that they in turn could provide Plaintiff with the medical care he needed and in fact desired. Document No. 36 ex. E at 60, 83.

Moreover, contrary to Plaintiff's assertion, the uncon-troverted summary judgment evidence is that Plaintiff was *not* "receiving care from the paramedics" when Elizondo entered the

12

ambulance.  Rather, the EMTs had already stopped trying to treat
Plaintiff because they believed "the scene [was] too uncontrolled
[and] too unsafe for [them] to attempt any patient care."  <u>Id.</u> ex.
H at 63-65.  In fact, Sparks--having concluded that Plaintiff was
"a threat to the EMS and fire department's safety"--"turned the
scene over to [Elizondo's] discretion as far as scene safety."  <u>Id.</u>
ex. H at 63-65.  Under these circumstances, Elizondo was justified
in entering the ambulance, taking control of scene safety, and
using force to restrain Plaintiff so that the EMTs could provide
him with medical treatment.  *See* <u>Rideau</u>, 949 F.2d at 720 (holding
that community caretaking function authorized police officers to
detain plaintiff--who was found standing in the middle of a road at
night, dressed in dark clothing, and apparently intoxicated--
because he "present[ed] a hazard to himself and to others," and
noting that officers "would have been derelict in their duties" had
they not detained plaintiff to check on his condition); *see also*
<u>Winters v. Adams</u>, 254 F.3d 758, 760 (8th Cir. 2001) (holding that
community caretaking function authorized officers, who had
witnessed no illegal activity by plaintiff but who believed he was
seriously mentally impaired or under the influence of a controlled
substance and in need of medical assistance, forcibly to remove
plaintiff from his car; <u>Tinius v. Carroll County Sheriff Dep't</u>, 321
F. Supp. 2d 1064, 1074-76 (N.D. Iowa 2004) (holding that plaintiff,
who was walking along a rural road in the middle of winter without

13

a coat and who appeared to be mentally unstable or under the influence of some unknown substance, posed a safety hazard to himself and others, such that officers were justified pursuant to their community caretaking function in transporting him to the hospital for medical and/or psychological treatment and, once there, intervening during a catheterization procedure in order to provide protection to the hospital staff).

Elizondo's intervention in the ambulance was reasonable and in keeping with his community caretaking function and therefore did not constitute an unlawful seizure. Because Elizondo's actions did not violate Plaintiff's constitutional right to be free from unreasonable seizures, Elizondo is entitled to summary judgment on Plaintiff's unlawful seizure claim.

2.   <u>Excessive Force Claim</u>

Plaintiff also alleges that by using the Taser, Elizondo violated Plaintiff's right to be free from excessive force.  A claim that a law enforcement officer used excessive force in the course of a seizure is analyzed under the Fourth Amendment and its reasonableness standard.  <u>Graham v. Connor</u>, 109 S. Ct. 1865, 1871 (1989).  To bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that he was seized.  <u>Flores</u>

14

v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004).[8]  He must
then show that he suffered an injury that resulted directly and
only from the use of objectively unreasonable force that was
clearly excessive to the need.  See Tarver v. City of Edna, 410
F.3d 745, 751 (5th Cir. 2005); Flores, 381 F.3d at 396; Ikerd v.
Blair, 101 F.3d 430, 433-34 (5th Cir. 1996).

Elizondo first argues that Plaintiff has failed to show that
he sustained a cognizable injury as a result of the tase.   A
plaintiff alleging an excessive force violation must show that he
has suffered "at least some injury."   Flores, 381 F.3d at 397.
Although the Fifth Circuit no longer requires "significant injury"
for excessive force claims, the plaintiff's injury must be more
than de minimis.  See Tarver, 410 F.3d at 752; Ikerd, 101 F.3d at
434-35.   "[C]ertain injuries are so slight that they will never
satisfy the injury requirement."  Flores, 381 F.3d at 397-98.  For
example, "handcuffing too tightly, without more, does not amount to
excessive force."  Glenn v. City of Tyler, 242 F.3d 307, 314 (5th
Cir. 2001); see also Tarver, 410 F.3d at 752 (holding that "acute
contusions of the wrist" were de minimis injuries); Crumley v. City
of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003) (stating that for
the application of handcuffs to amount to excessive force there
must be something beyond allegations of minor injuries).   In

---

[8] The parties' arguments do not address this point, and the
Court therefore assumes arguendo that a seizure occurred when
Elizondo tased Plaintiff.

determining whether an injury is more than de minimis, the context in which the force was deployed must be considered. <u>Ikerd</u>, 101 F.3d at 434.

During his deposition, Plaintiff testified that he suffered "a few seconds" of physical pain in his head when he was tased and that the Taser left two red marks where it made contact on his back. Document No. 36 ex. E at 64-65, 72. However, Plaintiff testified that the red marks did not require any medical treatment beyond one application of "salve," did not subsequently cause him any pain, were not permanent, and in fact healed shortly after the tasing incident, possibly even the same day. <u>Id.</u> ex. E at 65-67. When considered in the context in which the Taser was used, the Taser marks--much like the plaintiff's "acute contusions of the wrist" in <u>Tarver</u>--were no more than a de minimis injury.[9] When asked what other problems he suffered as a result of the tase, Plaintiff stated only that he was "real angry," his heart was broken, and he feared what might happen the next time he called for

_____

[9] Plaintiff contends in his response brief that the tasing may also have caused a possible "long-term medical effect on the reoccurrences of [his] seizures." *See* Document No. 43 at 15-16. In support of this contention, Plaintiff cites only the deposition testimony of his wife. <u>Id.</u> at 16. However, the summary judgment record contains no evidence that Kelly Stanley is qualified to express an expert opinion as to the medical effects of the tasing on Plaintiff's seizure disorder, and much of her cited testimony is inadmissible hearsay. *See* Document No. 36 ex. F at 45-46; *see also* FED. R. EVID. 701, 702, 801(c), 802. Accordingly, Kelly Stanley's testimony is not probative evidence that the tasing caused Plaintiff to suffer any "long-term medical effect."

an ambulance.  Id. ex. E at 72-73.  Plaintiff has submitted no evidence concerning the severity of these psychological "injuries," however, and Plaintiff does not appear to have required any medical treatment for them.  Thus, Plaintiff has failed to present summary judgment evidence that he suffered a degree of injury, physical or psychological, that was more than de minimis.

However, even if Plaintiff's alleged injuries were greater than de minimis, the summary judgment evidence does not support a finding that Elizondo's use of the Taser was clearly excessive or objectively unreasonable.  "In gauging the objective reasonableness of the force used," the court "must balance the amount of force used against the need for that force."  Ikerd, 101 F.3d at 434.  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 109 S. Ct. at 1872.  "The amount of force that is constitutionally permissible, therefore, must be judged by the context in which that force is deployed." Ikerd, 101 F.3d at 434.

As observed above, in exercising his community caretaking function Elizondo was justified in using some force to restrain Plaintiff in order to protect the EMTs and enable them to provide Plaintiff with the medical care he needed.  Plaintiff does not

17

dispute that there was a need for some use of force, but he
contends that Elizondo should have "made [an] attempt at physical
restraint" by "applying physical strength and skill" rather than
the Taser. *See* Document No. 43 at 12-14. However, "[t]he
'reasonableness' of a particular use of force must be judged from
the perspective of a reasonable officer on the scene, rather than
with the 20/20 vision of hindsight." <u>Graham</u>, 109 S. Ct. at 1872.
The fact that "in retrospect, there may have been alternative
courses of action for [Elizondo] to take" does not render
Elizondo's use of the Taser excessive or unreasonable. *See* <u>Mace v.
City of Palestine</u>, 333 F.3d 621, 625 (5th Cir. 2003).

When Elizondo confronted Plaintiff inside the ambulance,
according to the uncontroverted summary judgment evidence,
Plaintiff was a volatile and very muscular man who was on a cycle
of steroids; Plaintiff was dressed only in boxer shorts and was
sweating profusely, making it difficult to grasp or hold him;
Plaintiff was resisting the efforts of the EMTs and at least two
firemen to restrain him physically and he was making movements
sufficiently forceful and severe to cause the EMTs to abandon their
attempts to provide medical treatment because of fear for their own
safety; and Plaintiff was unresponsive to the EMTs' verbal pleas
and may not have been "fully functioning mentally at this point."
Before using the Taser, Elizondo spent three to five minutes using
verbal control tactics in an unsuccessful effort to calm Plaintiff

down, after which Elizondo's only use of force consisted of a one to two second tase that inflicted no serious injury upon Plaintiff. This measured use of force, however, successfully defused the situation. Under the totality of these circumstances, Elizondo's use of the Taser was not unreasonably disproportionate to the need for force. In fact, Elizondo's decision to use the Taser may well have prevented much greater harm to Plaintiff and/or to other people in the ambulance had Elizondo engaged in a physical struggle to restrain Plaintiff. *See* Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that officer's single use of taser gun to effect arrest of person who was agitated and uncooperative did not constitute excessive force, even though officer did not start with a verbal arrest command or an attempted physical handcuffing, because those actions "would likely have escalated a tense and difficult situation into a serious physical struggle in which either [the plaintiff] or [the officer] would be seriously hurt.").

In response to the motion for summary judgment, Plaintiff's counsel argues that there is evidence that Elizondo's use of the Taser was objectively unreasonable because: (1) Plaintiff was suffering a seizure in the back of the ambulance and did not understand Elizondo's verbal warnings prior to deploying the Taser; and (2) Elizondo had previously used the Taser inappropriately during "horesplay" with two police trainees. *See* Document No. 43 at 12-15. These arguments are without merit. First, both

19

Plaintiff and Sparks specifically testified that Plaintiff was not suffering a grand mal seizure when he was in the back of the ambulance, and there is no summary judgment evidence to the contrary. *See* Document No. 36 exs. E at 75; H at 71.  Plaintiff also testified that he was "somewhat able to comprehend what [was] going on," that he heard Elizondo state that he was going to tase Plaintiff if Plaintiff did not cooperate with the EMTs, and that he heard Elizondo state, "You leave me no choice."  <u>Id.</u> ex. E at 60-61, 75.  However, regardless of whether Plaintiff was actually suffering a seizure, he was acting out in a manner that the EMTs and Elizondo perceived as "violent," "combative," and "aggressive." That Plaintiff may not have been "fully mentally functioning" and "couldn't help what [his] body was doing at the time" does not raise a genuine issue of material fact that Elizondo's use of the Taser was excessive or unreasonable, given the safety risk posed by Plaintiff's movements.

Similarly, the fact that Elizondo engaged in "horseplay" with his Taser and two police trainees has no bearing on whether his use of the Taser on Plaintiff was excessive or unreasonable.[10]   To be

---

[10] It is undisputed that while acting as a field training officer, Elizondo engaged in horseplay with his Taser, jokingly using it on two of his trainees.  *See*, *e.g.*, Document No. 36 exs. B ¶ 18; B-2.  Both trainees, believing the tasings to be jokes, laughed about the incidents with Elizondo, and neither trainee reported or otherwise complained about the tasings.  <u>Id.</u>  When the tasings subsequently came to the attention of the Baytown Police Department, however, an internal investigation was launched, and Elizondo was disciplined for inappropriate use of his Taser.  <u>Id.</u>

sure, Elizondo's "horseplay" with the Taser was inappropriate and reflected poorly on his sense of humor and/or judgment, but it does not give rise to an inference that he used the Taser inappropriately in the much different context of this case.  In other words, the "horseplay" incidents do not create a genuine issue of material fact that Elizondo's use of the Taser on Plaintiff, in order to protect the EMTs and enable them to provide Plaintiff with medical treatment, was excessive or unreasonable.

In sum, Elizondo's use of the Taser on Plaintiff was not objectively unreasonable and therefore did not constitute excessive force within the meaning of the Fourth and Fourteenth Amendments. Accordingly, Plaintiff's excessive force claim fails as a matter of law, and Elizondo is entitled to summary judgment.[11]

B.   <u>The City's and Jones's Motion for Summary Judgment</u>

The City and Jones have also filed a motion for summary judgment, arguing, inter alia, that because Plaintiff cannot show that Elizondo's actions violated any of Plaintiff's constitutional rights, Plaintiff's municipal and supervisory liability claims fail as a matter of law.  The City and Jones are correct. *See* <u>Mace</u>, 333 F.3d at 625 (citing <u>City of Los Angeles v. Heller</u>, 106 S. Ct. 1571,

_____

[11] Because the Court concludes that Elizondo did not violate Plaintiff's Fourth Amendment rights as a matter of law, it is unnecessary for the Court to consider Elizondo's alternative argument that he is shielded from liability because he is entitled to qualified immunity.

1573 (1986)); <u>Saenz v. Heldenfels Bros., Inc.</u>, 183 F.3d 389, 392-93 (5th Cir. 1999); <u>Roberts v. City of Shreveport</u>, 397 F.3d 287, 292 (5th Cir. 2005); <u>Wilson v. Johnson</u>, 129 Fed. Appx. 116 (5th Cir. 2005) (unpublished).  Because Elizondo did not violate Plaintiff's constitutional rights, the City's and Jones's motion for summary will be granted.

### IV.  Order

Accordingly, it is

ORDERED that Defendant Edgar Elizondo's Motion for Summary Judgment (Document No. 32) and Defendants City of Baytown, Texas's and Byron Jones's Motion for Summary Judgment (Document No. 34) are GRANTED, and Plaintiff Robert Stanley's case is DISMISSED.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 25th day of October, 2005.


EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE